IN THE UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LYNNE VERGNETTI, | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| v. | : | CIVIL NO. 3:13-CV-02332 |
| | : | |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | : | (Judge Brann) |
| | : | |
| | : | |
| | : | |
| Defendant | : | |

## **MEMORANDUM**

### **Introduction**

Plaintiff Lynne Vergnetti has filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Vergnetti's claim for supplemental security income benefits.

Vergnetti filed her application for supplemental security income benefits on December 22, 2010. Tr. 10.  Vergnetti claims that she became disabled on March 19, 2002. Tr. 10.  Vergnetti has been diagnosed with numerous impairments, including emphysema, parasomnia, narcolepsy, chronic obstructive pulmonary disease ("COPD"), major depressive disorder, panic disorder with agoraphobia, polysubstance abuse, myalgia, lumbar spine abnormalities, Hepatitis C, hip bursitis, carpal tunnel syndrome, and arthritis. Tr. 10-15, 206, 274. On April 14,

2011, Vergnetti's application was initially denied by the Bureau of Disability Determination. Tr. 10.

On June 9, 2011, Vergnetti requested a hearing before an administrative law judge ("ALJ"). Tr. 10. The ALJ conducted a hearing on February 3, 2012, where Vergnetti was represented by counsel. Tr. 42-99. On July 20, 2012, the ALJ issued a decision denying Vergnetti's application. Tr. 10-20. On July 9, 2013, the Appeals Council declined to grant review. Tr. 1. Vergnetti filed a complaint before this Court on September 6, 2013. Supporting and opposing briefs were submitted and this case became ripe for disposition on January 31, 2014, when Vergnetti declined to file a reply brief.

Vergnetti appeals the ALJ's determination on the broad grounds that the ALJ's decision was not supported by substantial evidence. Vergnetti argues the ALJ did not properly consider the totality of her physical impairments and her severe depression. For the reasons set forth below, this case is remanded to the Commission for further proceedings.

**Statement of Relevant Facts**

Vergnetti is 52 years of age, graduated from high school, and is able to read, write, speak and understand the English language. Tr. 159-60. Vergnetti also had vocational training in cosmetology. Tr. 94, 161.

Vergnetti's past relevant work included one month of cashier work in 1997, two days of work as a waitress in 1997, a few days spent working as a cashier in 1997, approximately one year spent as a waitress from 1997 to 1998, and approximately two years as a self-employed cleaner between 2000 and 2002. Tr. 106-07. Vergnetti's restaurant work as a waitress and cashier is classified as medium, semi-skilled work. Tr. 94. Her work as a cleaner is classified as light, unskilled work. Id.

### A.   Vergnetti's Mental Impairments

Documentation of Vergnetti's mental impairments reach back as far as 2002, when Vergnetti's treating physician, Michael Gilhooley, MD, mentions depression in his notes. Tr. 207. Dr. Gilhooley continued as Vergnetti's treating physician for at least eight years, during which time his notes, assessments, and prescribed treatments mention depression or depressive disorder no fewer than thirty-one times. Tr. 207, 208, 209, 210, 213-13, 214-15, 216, 218-19, 294, 296, 298, 300, 324, 326, 328, 331, 332-33, 335, 337, 340, 342, 343-44, 348, 349-50, 351-52, 353-54, 357-58, 359-60, 362, 363-64, 367-68. During this time period, Dr. Gilhooley prescribed a number of anti-depressant drugs, including Lexapro, Effexor XR, and Wellbutrin SR. Tr. 331. Dr. Gilhooley's records do not contain objective findings of depression and appear to be based more on the statements of Vergnetti. However, Dr. Gilhooley's records do demonstrate some instability in Vergnetti's

condition, with her feelings of depression often increasing, and occasionally decreasing. Tr. 335, 337, 347, 349. Dr. Gilhooley's records also reflect that Vergnetti tried unsuccessfully to discontinue medication at least twice, with feelings of depression returning each time. Tr. 351, 363.

Prior to 2002, Vergnetti sought counseling for her depression with Barbara MacLeod. Tr. 441. Ms. MacLeod counseled Vergnetti on and off for approximately twenty-four years. Id. In the year prior to Vergnetti filing her claim for benefits, she attended six months of group therapy. Id. On January 13, 2011, Ms. MacLeod wrote a letter opining that Vergnetti's mental and physical impairments had greatly affected her ability to function and made it impossible for Vergnetti to work. Tr. 442. Ms. MacLeod did not include any objective findings for her assessment, nor did she provide any evidence or documentation supporting her assessment.

On March 17, 2011, Tiffany Griffiths, Psy.D, a state agency psychological consultant, examined Vergnetti. Tr. 445. Dr. Griffiths diagnosed Vergnetti with "[m]ajor depressive disorder, recurrent and severe, panic with agoraphobia, [and] polysubstance abuse, in full-sustained remission." Tr. 450.

Dr. Griffiths' assessment concluded that Vergnetti suffered from marked limitations to her ability to interact appropriately with the public, supervisors, and with co-workers. Tr. 445. Dr. Griffiths also opined that Vergnetti had moderate

limitations in her ability to (1) understand and remember detailed instructions, (2) carry out detailed instructions, and (3) make judgments on simple work-related decisions.  Id.  Finally, Dr. Griffiths stated that Vergnetti had slight limitations in her ability to carry out short, simple instructions and respond appropriately to changes in a routine work setting.  Id.  Dr. Griffiths also assessed Vergnetti Global Assessment of Functioning ("GAF") score as 40.[1]  Id.

    Dr. Griffiths' findings were supported by her observations of Vergnetti's behavior and demeanor, Vergnetti's personal statements, and by objective tests. Dr. Griffiths noted that Vergnetti reported anxiety, irritability, and ruminating and racing thoughts.  Tr. 449.  Dr. Griffiths also noted that Vergnetti admitted to suicidal thoughts and a history of cutting.  Id.  Dr. Griffiths observed that Vergnetti appeared ill-at-ease, anxious, and lethargic.  Tr. 450.  She also observed that Vergnetti's mood was depressed, her affect was tearful, and that Vergnetti had observable psychomotor swelling.  Id.  Dr. Griffiths concluded that Vergnetti had poor concentration based on poor performance on a serial 7s task and a digit span task.  Id.  Finally, Dr. Griffiths concluded that Vergnetti's short-term memory was poor based on her inability to recall two out of three words after a delay.  Id.

---

[1] A GAF score of 31–40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. *Diagnostic and Statistical Manual of Mental Disorders* 3–32 (4th ed.1994). A GAF score of 41–50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. *Id.*

5

On April 14, 2011, James Vizza, Psy.D., a non-examining state agency psychological consultant, reviewed all relevant information in the case. Tr. 103-04. Dr. Vizza concluded that Vergnetti had moderate restrictions of her activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. Tr. 104.

### B. The Administrative Hearing

On February 3, 2012, Vergnetti's administrative hearing was conducted. Tr. 42-99. At that hearing, testimony was elicited from Vergnetti's friend Janet Rinaldi. Tr. 58-79. During this testimony, Ms. Rinaldi testified to Vergnetti having a "low affect," a great deal of anxiety and panic, and being depressed. Tr. 76-77. Vergnetti also testified at the hearing and stated, among other things, that she had been depressed for much of her life. Tr. 88-89.

After Vergnetti testified, Gerald Keating, an impartial vocational expert, was called to give testimony. Tr. 93. The ALJ asked the vocational expert to assume a hypothetical individual with Vergnetti's age, education, and work experience who was limited to light work[2] and could not work in unprotected heights or around

---

[2] Light Work is defined by the regulations of the Social Security Administration as work "with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine

6

dangerous, moving machinery. Id. Furthermore, the hypothetical individual could not be required to use ladders, scaffolds, or ropes except in emergencies, although the individual could use ramps or stairs at least occasionally. Id. The ALJ further proposed that this hypothetical individual could not work in environments where there would be concentrated exposure to respiratory irritants, such as odors, dusts, gases, fumes, or poorly ventilated work settings. Tr. 94-95. Finally, the ALJ limited the work setting to a moderate production pace that involved only simple workplace judgments and would be subject to only occasional changes in the work setting. Tr. 95.

The vocational expert first opined that this hypothetical individual would be able to perform Vergnetti's previous work as a cleaner. Id. The ALJ rules out this line of work due to respiratory concerns. Id. The vocational expert then testified, however, that this individual would be capable of performing three other jobs that exist in significant numbers in the national economy: a tagger/maker/labeler, a packer, and an assembler. Tr. 95.

The ALJ then modified the hypothetical question. The ALJ added that the individual would fall off task with regularity and required frequent, unscheduled breaks. Id. The individual would also be "prone to either diminution of work

---

that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 416.967.

7

efficiency, breaks of tasks – persistence, or distractibility of high propensity," and would have disproportionate reactions to even moderate, occasional changes within the work regimen, such that the individual would be prone to partial or whole day absenteeism.  Id.  The vocational expert testified that, under these circumstances, the hypothetical individual would not be able to engage in competitive work.  Id.

**Discussion**

In an action under 42 U.S.C. § 405(g) to review the Commissioner's decision denying a plaintiff's claim for disability benefits, the district court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence.  Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988), quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance.  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).  In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported


by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981), and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 203 (3d Cir. 2008). Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

The Commissioner utilizes a five-step process in evaluating disability insurance benefits claims. See 20 C.F.R. § 404.1520; Poulos v. Commissioner of Social Security, 474 F.3d 88, 91-92 (3d Cir. 2007). This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has

the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. See 20 C.F.R. § 404.1520.  The initial burden to prove disability and inability to engage in past relevant work rests on the claimant; if the claimant meets this burden, the burden then shifts to the Commissioner to show that a job or jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).

### A.  Step One

The ALJ at step one of the sequential evaluation process found that Vergnetti had not engaged in substantial gainful work activity since December 22, 2010, the date of Vergnetti's application for benefits. Tr. 12.  No error is alleged here.

### B.  Step Two

At step two of the sequential evaluation process, the ALJ found that Vergnetti suffered from three severe impairments: CPOD with mention of emphysema, parasomnia, and narcolepsy.  Tr. 12.  The ALJ further determined that Vergnetti suffered from several non-severe impairments, including depression, anxiety, a history of polysubstance abuse, a hallux-abductor valgus deformity on her right foot (post-surgery), L5 vertebrae abnormalities, myalgia, Hepatitis C, and arthritis.  Tr. 14-15.

The Social Security regulations contemplate the administrative law judge considering whether there are any medically determinable impairments at step two and then, when setting a claimant's residual functional capacity, considering the symptoms of both medically determinable severe and non-severe impairments. 20 C.F.R. § 404.1529.  The determination of whether a claimant has any severe impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. § 404.1520(c). If a claimant has no impairment or combination of impairments which significantly limit the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two. Id.

If a claimant has any severe impairments, the evaluation process continues. 20 C.F.R. § 404.1520(d)-(g).  A failure to find a medical condition severe at step two will not render a decision defective if some other medical condition was found severe at step two.  See, Rutherford v. Barnhart, 399 F.3d 546, 553 (3d Cir. 2005).

The ALJ gave adequate consideration to all impairments that Vergnetti established she suffered from at or after she filed for benefits.  Additionally, the ALJ found that several of Vergnetti's impairments were severe.  Tr. 12.  Therefore, it is irrelevant that the ALJ found several impairments to be non-severe; remand based on the ALJ's findings at step two is not warranted.

    **C.**    **Step Three**

At step three, the ALJ concluded that Vergnetti did not suffer from an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. Tr. 15-16. Vergnetti does not allege error with this finding.

### D.   Step Four

At step four of sequential evaluation process, the ALJ found that Vergnetti maintained the Residual Functional Capacity to perform light work. Tr. 16. The ALJ found that Vergnetti was limited in performing light work inasmuch as she was not able to work at unprotected heights or around dangerous, moving machinery. Id. The ALJ further found that Vergnetti could not be required to utilize ladders, scaffolds, or ropes except in emergencies. Id. Additionally, the ALJ found that Vergnetti could not work in any environment where there would be concentrate exposure to respiratory irritants. Id. Finally, the ALJ found that Vergnetti should work in a job with a moderate production pace, not a high volume, high intensity work pace, and that the job should involve only simple work place judgments, and should involve only occasional changes in the work setting. Id.

At step four, the ALJ posed a hypothetical question to the vocational expert that accurately depicted all of these limitations. Tr. 94-95. Based on this hypothetical question, the vocational expert testified that such a hypothetical

individual would be unable to return to Vergnetti's previous work. Tr. 95. However, in arriving at the aforementioned Residual Functional Capacity, the ALJ committed clear error by disregarding the opinions and medical evidence presented by several doctors in favor of engaging in his own lay-analysis of the limitations caused by Vergnetti's depression.

The ALJ rejected the opinion of Ms. MacLeod that Vergnetti's depression greatly affected her ability to function and made it impossible for Vergnetti to work. Tr. 12-13. The ALJ further rejected the assessment of Dr. Griffiths that Vergnetti suffered from marked limitations in her mental functioning due to severe depression. Tr. 13-14. The ALJ also rejected the assessment of Dr. Vizza, who assessed Vergnetti with moderate limitations due to depression. Id. Finally, the ALJ ignored nearly a decade of medical records provided by Vergnetti's treating physician, Dr. Gilhooley, that consistently referenced depressive disorder, and included numerous prescriptions for anti-depressant drugs.[3]

A residual functional capacity assessment must be based on a consideration of all the evidence in the record, including the testimony of the claimant regarding her activities of daily living, medical records, lay evidence and evidence of pain.

---

[3] Dr. Gilhooley's records end on October 13, 2010, just prior to Vergnetti filing for disability. Additionally, none of Dr. Gilhooley's records include objective medical findings supporting a diagnosis of severe depression. Nonetheless, the records are cumulative and are useful in evaluating Vergnetti's allegations of severe depression.

See Burnett v. Commissioner of Social Sec. Admin., 220 F.3d 112, 121-122 (3d Cir 2000).  Rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant.  See Doak v. Heckler, 790 F.2d 26, 29 (3d Cir.1986)("No physician suggested that the activity [the claimant] could perform was consistent with the definition of light work set forth in the regulations, and therefore the ALJ's conclusion that he could is not supported by substantial evidence."); 20 C.F.R. § 404.1545(a).  "Federal courts have repeatedly held that an ALJ cannot speculate as to a Plaintiff's RFC; medical evidence speaking to a claimant's functional capabilities that supports the ALJ's conclusion must be invoked."  Biller v. Acting Comm'r of Soc. Sec., 962 F.Supp.2d 761, 779 (W.D. Pa. 2013) (citations omitted).

   Here, the ALJ disregarded voluminous, if not overwhelming evidence, that Vergnetti's depression was severe and substantially affected her ability to perform work-related tasks.  Dr. Griffiths, an examining doctor, diagnosed Vergnetti with severe depressive disorder, panic with agoraphobia, and polysubstance abuse; she assessed Vergnetti's Global Assessment of Functioning score as 40.  Tr. 450.  As detailed previously, Dr. Griffiths' assessment concluded that Vergnetti suffered from moderate to marked limitations in her mental and social abilities.  Tr. 445.  These findings were supported by her observations of Vergnetti's behavior and

14

demeanor, Vergnetti's personal statements, and by objective tests, including a serial 7s task and a digit span task.  Id.

Dr. Griffiths' opinion was buttressed by Dr. Vizza's conclusion that Vergnetti had moderate restrictions in her activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties maintaining concentration, persistence, and pace.  Tr. 104.  Dr. Griffiths' opinion was also supported by Ms. MacLeod's assessment that Vergnetti's impairments, including depression, made it impossible for her to work.  Id.  Finally, Dr. Griffiths' assessment was further supported by eight years of medical records provided by Dr. Gilhooley, which frequently reference waxing and waning depression, and frequently include prescriptions for anti-depressant drugs.

Only two doctors of record, Dr. Griffiths and Dr. Vizza, offered an assessment of Vergnetti's mental impairments and concomitant limitations. Despite the evidence on record, the ALJ rejected the opinions of these two doctors in favor of his own lay-assessment of Vergnetti's mental impairments.  The ALJ concluded that Vergnetti's mental impairments caused her "no more than a mild degree of limitation" in all activities of daily living, social functioning, and

maintaining concentration, persistence, or pace.  Tr. 14.  Essentially, the ALJ eschewed medical evidence in favor of "playing doctor."[4]

Since the ALJ's assessment of Vergnetti's mental impairments, and its subsequent role in determining her residual functional capacity, were made without the support of any physician or psychiatric assessments, the ALJ's residual functional capacity assessment is inherently flawed.  Consequently, the residual functional capacity assigned to Vergnetti by the ALJ was not supported by substantial evidence.

### E. Step Five

At step five, the ALJ concluded that, given Vergnetti's residual functional capacity, she was capable of performing three jobs that exist in significant numbers in the national economy.  Tr. 19.  In making this determination, the ALJ posed a hypothetical question to a vocational expert.  Tr. 94-95.  The hypothetical question reflected the ALJ's flawed residual functional capacity assessment.  Id.  The vocational expert testified that under the circumstances presented in the hypothetical question, the individual would be able to perform three jobs that exist in significant numbers in the national economy.  Tr. 95-96.

---

[4] The ALJ's opinion clearly demonstrated his propensity for substituting his lay opinion with that of the two doctors. For example, at one point the ALJ rejects Dr. Griffiths' diagnosis of agoraphobia, stating "[a]goraphobia is more than a person feeling more 'comfortable' at home, but a condition that in most cases would manifest to prevent excursion by the person suffering this condition, outside of the confined safety zones by this afflicted individual." Tr. 14.

16

As the residual functional capacity used by the ALJ was flawed, the hypothetical question posed by the ALJ did not accurately reflect Vergnetti's actual ability to work. Therefore, the ALJ's determination that Vergnetti could perform jobs that exist in a significant number in the national economy is not supported by substantial evidence.

**Conclusion**

A review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence. Pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner is vacated, and this case is remanded for further proceedings.

An appropriate Order will be entered.

BY THE COURT:

s/Matthew W. Brann
Matthew W. Brann
United States District Judge

Dated: April 18, 2014